58

                        CARELLO

1

2    time?

3        A      No.

4        Q      Did he attempt to read anything

5    to you?

6        A      No.

7        Q      What makes you say that it

8    looked like he had something that he

9    wanted to read?

10       A      Because he had something in his

11   hand.  As I seen him by the front

12   window --

13           MR. McGOWAN:  I believe he also

14       testified he wanted -- didn't he say

15       he wants to read you something --

16           THE WITNESS:  Yes.

17           MR. McGOWAN:  -- and follow him

18       into the room?  Which is what he

19       testified to.

20           THE WITNESS:  Exactly.

21           MR. LOOMBA:  Could you read his

22       answer back before counsel

23       interjected.

24           (Record read.)

25       Q      Which front window are you

59

1          CARELLO

2    referring to in the public lobby?

3         A     The lobby you first walk into

4    the police station.

5         Q     So you are referring when he

6    came the second time?

7         A     Yes.

8         Q     And he was holding something?

9         A     He was holding something in his

10   hand.

11        Q     When you got into the interview

12   room the second time, who spoke first?

13        A     I believe he did.

14        Q     Do you remember what he said?

15        A     He said something along the

16   lines that I don't think you were

17   harassed.

18        Q     Do you recall anything else

19   that he may have said at that point?

20        A     Not at that very point because

21   I had said something along the lines that

22   not only did I feel harassed, but I felt

23   threatened.

24              Then he said something along

25   the lines that now I'm embellishing my

60

CARELLO

1

2    story, and I said I'm not embellishing my

3    story.   I said this is how the events had

4    happened, and I told him, I said and,

5    furthermore, I said how come nobody came

6    to respond to my 911 call when I was out

7    there, and I was pointing out to North

8    Avenue, and he responds by saying don't

9    point your finger at me, and gets out of

10   his chair and violently attacks me.

11       Q      Were you pointing your finger

12   at him?

13       A      No, I was pointing my finger

14   towards the direction of North Avenue

15   where the incident took place.

16       Q      Were you seated at the point

17   when you were pointing your finger --

18       A      Yes.

19       Q      -- or were you standing up?

20       A      I'm sitting down.  And Sergeant

21   Rosenbergen is sitting down as well.

22       Q      You said there was a point in

23   time that Sergeant Rosenbergen got up?

24       A      Yes.

25       Q      What was said immediately

61

CARELLO

1
2  before that?

3      A      He said don't point your finger

4  at me, and then came across the corner of

5  the table and took me by my throat out of

6  my seat.

7      Q      Before he got up, do you recall

8  him requesting that you leave the room?

9      A      Not at all.  Never.

10     Q      You are a hundred percent sure

11 of that?

12     A      I'm a hundred percent sure.

13     Q      When he got up, can you just

14 describe as best you can how did he

15 actually touch you.

16     A      He just came by and grabbed me

17 by my throat.  Very fast.  Because I

18 couldn't defend myself, it happened so

19 quickly.

20     Q      Was he using one hand, two

21 hands?

22     A      I don't remember at the time,

23 but it was definitely one hand, at least

24 one hand.

25     Q      Can you indicate where on your

62

```
 1            CARELLO
 2  throat that he touched you with his hand?
 3      A     By showing you?
 4      Q     You have to use words to
 5  describe it.  It won't come out on the
 6  transcript.
 7      A     I would show the pictures --
 8            MR. McGOWAN:  No, just verbally
 9      put on the record as best you can
10      where on your neck.
11      Q     If you want, you can use your
12  hand to position it and I will put on the
13  record --
14            MR. McGOWAN:  Just do your best
15      to verbally describe it.
16      A     As far as I could best
17  describe, I was sitting in the seat
18  across from him.  He gets out so quickly,
19  I can't even move, takes me by my throat,
20  I guess hands around my neck, pushed me
21  up against the wall and then lifts me up
22  out of my seat from my chair.
23      Q     So is his hand on the front of
24  your neck, on the side of the neck, on
25  the back of the neck?
```

63

CARELLO

1

2      A      It's in the front, and the

3  fingers are on the side.

4      Q      Would you say the tips of his

5  fingers are underneath your right ear or

6  underneath your left ear?

7      A      Left.

8              MR. McGOWAN:  The tips of his

9      four fingers?

10             MR. LOOMBA:  That's right.

11     These, index through pinkie.

12             MR. McGOWAN:  I don't think a

13     thumb is a finger.

14             MR. LOOMBA:  So stipulated.

15     Q      As he did this, did he say

16  anything?

17     A      Immediately -- if he did, I

18  don't remember.

19     Q      Were you saying anything?

20     A      No.

21     Q      You say he lifted you up?

22     A      Yes.

23     Q      Did you get to your feet at

24  that point?

25     A      Yes.

64

1          CARELLO

2     Q     So your weight was supported by

3   your feet --

4     A     Yes.

5     Q     -- and your legs?

6     A     Yes.

7     Q     Is that right?

8     A     Uh-huh.

9     Q     Say "yes."

10    A     I said "yes".

11    Q     You said "uh-huh."  She can't

12  take that one down.

13          So you are standing up.  Is

14  Sergeant Rosenbergen still touching you

15  at that point?

16    A     Yes.

17    Q     Can you describe how he's

18  touching you?

19    A     All I know is he grabs me at

20  the back of my neck, from the front to

21  the back, and pulls me out of the room by

22  my neck and my jacket.

23    Q     Did you have anything on the

24  table before this happened, by the way?

25    A     I --

65

1          CARELLO

2      Q      For example, your wallet, car

3  keys.

4      A      I had items with me, because I

5  had to go back and get them.

6      Q      So when you went in the room

7  the second time, you are saying, you put

8  items on the table?

9      A      I don't recall if they were on

10  a table or a chair in there, but I had

11  items with me in the room.

12      Q      And you had removed them from

13  your pockets?

14      A      They were never in my pocket.

15      Q      You carried them in there with

16  your hand?

17      A      Yes.

18      Q      And then you placed them down?

19      A      Yes.

20      Q      Now, he moved you outside the

21  room, is that is that your testimony?

22      A      Yes.

23      Q      This is outside of the

24  interview room?

25      A      Outside of the interview room.

67

CARELLO

1      lobby.

3      Q      In the interior lobby.

4      A      When he dragged me out of the

5   interview room into the interior lobby

6   into the main area where the window is,

7   there were people in the main area.

8             MR. McGOWAN:  The question was,

9      was there anybody in the interior

10     lobby, that you remember.

11     A      No.

12     Q      How did you move from the

13  interior lobby to the main lobby this

14  second time?

15     A      I was thrown.

16     Q      Can you describe that with

17  anymore detail?

18     A      I was thrown by Sergeant

19  Rosenbergen from the interior lobby into

20  the main lobby.

21     Q      Did he pick you up off the

22  ground?  Is that what you are testifying?

23     A      No.

24     Q      So are you saying that he

25  pushed you into the main lobby or are you

68

CARELLO

1

2    saying that he picked you up and --

3        A    I was thrown from my jacket and

4    neck.  He was trying to throw me down to

5    the ground but I caught my balance.

6        Q    Was anybody in the position to

7    witness that portion of what you are

8    testifying to?

9        A    Yes.

10       Q    Who would that be?

11       A    I don't know their names.  I

12   identified to Lieutenant Fortunato that

13   there were people in the lobby when this

14   incident occurred, and I thought he would

15   do some research and try to find out who

16   they were but I never heard back from

17   him.

18       Q    As far as you could tell, were

19   they in uniform?

20       A    They were not in uniform.

21       Q    Do you believe they were

22   citizens?

23       A    I believe they were citizens.

24   I'm not sure.

25       Q    Did you ever speak to any of

71

1              CARELLO

2      A      No, it wasn't.

3      Q      This is your best recollection,

4  right?

5             MR. McGOWAN:  That's the way you

6      recall it?  Then say "yes."

7      A      That's the way I recall it.

8      Q      Where did you go when you left

9  the headquarters?

10     A      I went outside of the building.

11     Q      Did you go anywhere else?

12     A      Maybe to my car.

13     Q      Where did you drive your car

14  to?

15     A      I didn't drive at that point.

16     Q      What did you do when you got to

17  your car?

18     A      I called my brother.

19     Q      Which one?

20     A      My brother James.

21     Q      That's the one who then resided

22  in New Rochelle?

23     A      Yes.

24     Q      What did you tell him -- before

25  I ask that, was he there when you called

72

1          CARELLO

2   him.

3          MR. McGOWAN:   Did he pick up the

4      phone?

5          MR. LOOMBA:   Yes.

6      A     Yes.

7      Q     What did you tell him?

8      A     I told him what had happened to

9   me, and he said he was going to come on

10  up.

11     Q     What happened after that?

12     A     I called the Police

13  Commissioner's office.

14     Q     Did you speak with anybody

15  there?

16     A     I spoke to a woman who had told

17  me to call back later, and I called back

18  later and she said to meet with Sergeant

19  Wilson in the lobby, and when I went to

20  the lobby Sergeant Wilson wasn't there,

21  so I called her again and she said she

22  was coming down and she said you will

23  meet Lieutenant Masseo, so I met

24  Lieutenant Masseo and her in the lobby.

25     Q     What was the name of the woman

CARELLO

1

2      Q      Did you ever stand up and point

3   your finger in any direction while you

4   were in the interview room the second

5   time?

6      A      Not that I recall.

7      Q      Do you recall Sergeant

8   Rosenbergen asking you to leave the

9   interview room?

10          MR. McGOWAN:  You can answer it

11      again.

12      A      I do not recall that.

13      Q      So skipping back forward,

14   you -- we get to the point where you are

15   with your brother and you are in the

16   lobby, the public lobby of the

17   headquarters, and there is Lieutenant

18   Masseo and this other woman who you think

19   her name is Gina.  Is that correct?

20      A      That's correct.

21      Q      What happens at this point?

22      A      Gina walks away and Lieutenant

23   Masseo asks my brother and myself to come

24   into an interview room.

25      Q      And you go into an interview

77

```
 1              CARELLO
 2   room?
 3       A     Yes.
 4       Q     This is a different room or the
 5   same room that you were --
 6       A     It's a room adjacent to it.
 7   It's a different room.
 8       Q     Was it large or small or the
 9   same size?
10       A     I wouldn't know.
11       Q     What happens when you get
12   inside this other interview room?
13       A     I told Lieutenant Masseo what
14   had happened, from getting pulled over
15   until the incident with Sergeant
16   Rosenbergen.
17       Q     Is there anyone in the room
18   besides you, your brother and Lieutenant
19   Masseo at this time?
20       A     No.
21       Q     What did Lieutenant Masseo say?
22       A     I don't recall.
23       Q     Did your brother say anything
24   during the meeting?
25       A     He may have, I don't recall.
```

78

CARELLO

    Q    Did you fill out a written
complaint?

    A    Yes.

    Q    When did that occur?  When did
you --

         MR. LOOMBA:  Strike that.

    Q    When did you fill out the
written complaint?

    A    After talking with Lieutenant
Masseo.

    Q    Where were you when you filled
out the written complaint?

    A    I was in the interview room
with Lieutenant Masseo and my brother.

    Q    So it immediately followed your
verbal interview with him?

    A    Yes.

    Q    When you finished filling out
your written complaint, what did you do
with it?

    A    I believe I gave it to
Lieutenant Masseo.

         MR. LOOMBA:  Mark that.

         (Defendants' Exhibit B, Civilian

83

CARELLO

2      Rosenbergen" and then we are going to

3      stop at "nowhere"?

4          Q      Do you see where it says "out

5   of nowhere got out of his chair"?  Do you

6   see that?

7          A      Yes.

8          Q      Just start there and read that

9   out loud for the record, if you would.

10         A      "Sergeant Rosenbergen then

11  said 'don't you ever point your finger at

12  me.'"  Then I have in parentheses, "which

13  I did as I was sitting in my seat telling

14  him how upset I was and how nobody

15  responded to my call and out of nowhere

16  he got out of his chair."

17         Q      Thank you.

18                Now this is your handwriting,

19  this is the complaint that you made?

20         A      That's correct.

21                Just so you know --

22         MR. McGOWAN:  Wait for the

23      question.

24         Q      There's no pending question.

25         MR. McGOWAN:  We're done with B?

84

CARELLO

MR. LOOMBA:  Yes.

Q       After you filled out this
complaint you said you gave it to
Lieutenant Masseo, is that right?

A       Yes.

Q       What happened after that?

A       I think I had just left at that
point after I gave him that.

Q       Do you remember where you went?

A       Immediately -- I'm not sure.

Q       Did you go to a restaurant?

A       Later in the day I did, yes.

Q       What restaurant was that?

A       On The Waterfront.

Q       While there did you take any
photographs?

A       Yes.

Q       Who took the photographs?

A       It was my brother.

Q       Whose camera was it?

A       I don't remember if it was his
or mine.

Q       Do you still have the originals
of those photographs?

89

1                     CARELLO

2  the D.A.'s office?

3      A     I don't recall.

4      Q     Did you ever exchange anything

5  in writing at the D.A.'s office

6  concerning this incident?

7      A     I don't recall.

8      Q     Did you speak with Lieutenant

9  Fortunata on any other occasion other

10  than the one you testified to?

11      A     I don't recall.

12      Q     I am going to ask a series of

13  questions about your injuries that you

14  are claiming for this incident.

15            What injuries are you claiming

16  to have suffered as a result of this

17  incident?

18            MR. McGOWAN:  Physical?

19            MR. LOOMBA:  Yes.

20            MR. McGOWAN:  Any?

21            MR. LOOMBA:  Any.

22      Q     But just to make it organized,

23  let's start with physical injuries.

24      A     Physically I have a lot of pain

25  in my back, my neck and my head.

99

CARELLO

1

2      A      I don't remember.

3      Q      Besides Dr. Guarino, have you

4  seen any other chiropractors?

5      A      Yes.

6      Q      How many other chiropractors

7  have you seen?

8      A      I don't recall.

9      Q      Do you remember the names of

10  any of them?

11      A      Yes.

12      Q      Tell me those names.

13      A      I remember Dr. Kenneth Trotta.

14  That's all I can think of right now.

15      Q      There was another one but you

16  can't remember his name?

17      A      There may have been.

18      Q      Where is Dr. Trotta -- is that

19  T-R-O-T-T-A?

20      A      Yes.

21      Q      Where is his office?

22      A      He's on Central Avenue in

23  Hartsdale.

24      Q      When was the first time that

25  you saw Dr. Trotta?

100

1                           CARELLO

2        A      I don't recall.

3        Q      Was it before January 11, 2006?

4        A      Yes.

5        Q      Approximately, or the best of

6    your recollection, how many times did you

7    see Dr. Trotta before January 11, 2006?

8        A      I don't recall.

9        Q      More than ten?

10       A      I don't recall.

11       Q      More than five?

12       A      I don't recall.

13       Q      What about after January 11,

14   2006, did you ever go to see Dr. Trotta?

15       A      Yes.

16       Q      Do you remember when after

17   January 11, 2006 you first saw

18   Dr. Trotta?

19       A      I don't recall.

20       Q      Between January 11, 2006 and

21   today, so it's about almost, I guess

22   we're coming on about a year and

23   three-quarters, how many times have you

24   seen Dr. Trotta?

25       A      I don't recall.

101

1          CARELLO

2      Q      Besides Dr. Guarino and

3  Dr. Trotta, any other chiropractors that

4  you went to see?

5      A      Are you talking after

6  January --

7      Q      At anytime in your life.

8      A      I don't recall.

9      Q      There may have been but you

10  can't remember, is that your testimony?

11      A      I'm saying I don't recall.

12      Q      Is there anything that you

13  could refer to to refresh your

14  recollection?

15      A      I don't know.

16      Q      When you went to see

17  Dr. Guarino, was that covered by health

18  insurance through your Beechmont Bus

19  Holding or Beechmont Bus Services?

20      A      It either could have been

21  through my health insurance or through

22  No-Fault policy if it was for an

23  accident.

24      Q      What was the health insurance

25  company that you received health

102

CARELLO

1

2  insurance from?

3      A      I had two different coverages.

4  One time I had Aetna and one time I had

5  Empire Blue Cross/Blue Shield.  When each

6  one went into effect I don't recall.

7      Q      Both of those policies were

8  provided through Beechmont?

9      A      Yes.  Either the Bus Service or

10  the holding company.

11      Q      Depending on the dates?

12      A      Depending on the dates.

13      Q      When did that change, by the

14  way?

15      A      2003.

16      Q      When in 2003?

17      A      December.

18      Q      Do you have a personal

19  physician or a general care provider or

20  something like that?

21      A      Yes.

22      Q      Is that a man or a woman?

23      A      A man.

24      Q      What's his name?

25      A      Martin Engelhardt.

103

CARELLO

Q       Where is his office?

A       Quaker Ridge Road in New Rochelle.

Q       Have you seen him in 2007?

A       Not in --

MR. McGOWAN:  In 2007.

A       Not in a professional capacity.

Q       You know him socially?

A       I seen him at a social -- I seen him at a funeral, at a wake.

Q       How about have you seen him for medical services in 2006?

A       I recall going to his office and he wasn't in, in 2006.  I don't recall if I seen him at all as a patient.

Q       Does he have a -- does he have partners that he practices with, so if he wasn't there --

A       There's a group of people there.

Q       What's the name of the medical group that he practices in?

A       I don't recall.

Q       When you went there and he

104

CARELLO

1

2    wasn't there, do you remember the date?

3    Was it after January 11th?

4        A        I don't recall.

5        Q        Did you see one of the other

6    doctors in the group when you were there?

7        A        I think I just seen the

8    receptionist.  I don't think I seen

9    anybody when I went.

10       Q        What prompted you to go to

11   Dr. Engelhardt's office in 2006?

12       A        It wasn't related to the

13   incident.

14       Q        Have you seen, other than a

15   chiropractor, did you go to see a doctor

16   concerning any of the injuries you claim

17   from the incident?

18       A        Did I see a doctor?  Besides a

19   chiropractor being a doctor?

20       Q        Putting the chiropractors to

21   one side.  Let's focus on saying medical

22   doctors.

23              After January 11, 2006, did you

24   go to see a medical doctor --

25       A        I've seen a medical doctor, a

105

1                    CARELLO

2    psychiatrist --

3        Q        Excuse me.   Let me finish the

4    question.

5              Did you go to see a medical

6    doctor concerning any of the injuries you

7    claim, any of the physical injuries you

8    claim from the incident of January 11,

9    2006?

10       A        No.

11       Q        Did you ever go to an emergency

12   room for any of the physical injuries you

13   claim?

14       A        No.

15       Q        Did you have any X-rays or MRIs

16   or any other radiological scans

17   concerning the head, neck and back

18   injuries that you are claiming from

19   January 11, 2006?

20       A        There may well be.   I don't

21   recall.

22       Q        Where would they have been

23   conducted?

24       A        Dr. Trotta's office most

25   likely.

106

1                       CARELLO

2      Q      Other than Dr. Trotta's office,

3  you don't remember going to South Shore

4  or anything like that for X-rays or MRIs?

5      A      No.

6      Q      On January 11th, 2006, was

7  Sound Shore within your medical coverage?

8  Was that a hospital that would have been

9  covered if you had a serious accident, if

10 you know?

11     A      I don't know.

12     Q      Besides the neck, back and

13 headaches, any other physical injuries

14 you're claiming from January 11, 2006?

15     A      No.

16     Q      I believe you testified that

17 there's some emotional injuries that you

18 are claiming.

19     A      Yes.

20     Q      What's the nature of those?

21     A      Fear, anxiety, depression.

22     Q      Have you sought treatment for

23 that?

24     A      Yes.

25     Q      When did you --

107

CARELLO

2          MR. LOOMBA:   Strike that

3      question.

4      Q      Before the incident, have you

5  ever sought treatment for any type of

6  emotional problem of any type?

7      A      No.

8      Q      Have you ever seen a

9  psychologist before swan 11, 2006?

10     A      Not that I recall.

11     Q      Psychiatrist?

12     A      Not that I recall.

13     Q      Who did you seek treatment

14  from?

15     A      Harbour Pointe.

16     Q      Where is that?

17     A      Baltimore, Maryland.

18     Q      What is Harbour Pointe?

19     A      It's an inpatient -- it's an

20  inpatient institution for psychiatry and

21  psychology.

22     Q      Were you admitted there?

23     A      Yes.

24     Q      When was that?

25     A      That was August of this year.

108

CARELLO

Q    What was the day in August?

A    I'm not sure.

Q    How long were you a patient?

A    Five weeks.

Q    How many different
psychiatrists did you see there?

A    Psychiatrists?

Q    Or any kind of medical or
mental health provider.

A    There are numerous -- I've seen
different ones different days, so I can't
put a number on it.

Q    Did you have somebody who was,
say, primarily in charge of your
treatment?

A    I'm trying to think.  I'm
trying to think of the director's name.

     (Pause.)

A    Mike Osborne.

Q    How was it that you were
admitted to Harbour Pointe?

A    I was looking for a place to
deal with some of my emotions, and it
looked like it was a good place for me.

109

CARELLO

1

2      Q      Did anybody recommend Harbour

3  Pointe to you?

4      A      One of my brothers did.

5      Q      Which one?

6      A      Joseph.

7      Q      In your family is there any

8  history of psychiatric illness?

9      A      No.

10     Q      Was there any event in your

11 life that prompted you to seek out a kind

12 of inpatient facility for psychiatric

13 care?

14          MR. McGOWAN:  I don't know, and

15      I don't know that you know, that it's

16      an inpatient facility for psychiatric

17      care.

18          I'm just going to object to

19      that, but answer the question.

20     A      Repeat the question.

21          MR. McGOWAN:  Let's have it read

22      back.

23          (Record read.)

24     A      I am going to have to say that

25 the January 11, 2006 event was one of the

110

                    CARELLO

1   participating factors.

2

3       Q       What were the other

4   participating factors?

5       A       A divorce.

6       Q       When were you divorced?

7       A       2003.

8       Q       And when were you married?

9       A       1997.

10      Q       Did you have any children?

11      A       No.

12      Q       Out of that marriage do you

13  have any children?

14      A       No.

15      Q       Are there any other factors

16  besides your 2003 divorce and the January

17  11, 2006 incident that you would describe

18  a contributing factor to you seeking

19  treatment at Harbour Pointe?

20      A       Probably numerous.  Those two

21  are definitely up there on the list.

22      Q       Well, can you list any other?

23  You said there are numerous, but can you

24  specify?

25      A       I would say the way I was

CARELLO

1   dealing with my daily activities.

3       Q      Did you ever have a substance

4   abuse problem, alcohol and drugs?

5       A      No.

6       Q      What do you mean by the way you

7   were dealing with your daily activities?

8       A      A person who retired young with

9   a lot of time on his hands.

10      Q      Did your divorce in 2003 have

11  anything to do with the transfer of that

12  business from the Bus Services to the Bus

13  Holding?

14      A      No.  It's just coincidental.

15      Q      A couple more questions.

16             Steven Ferrara, who is that?

17      A      Stefan Ferrara.

18      Q      Sorry.  Stefan, S-T-E-F-A-N?

19      A      Yes.

20      Q      Who is that?

21      A      That's a friend of mine.

22      Q      Where does he live?

23      A      He lives in Mount Vernon, like

24  9 Pearsall Drive.

25      Q      What's his telephone number?

119

CARELLO

1

2      Q      Ann Freeman I believe you

3  mentioned is your sister.

4      A      Yes.

5      Q      Is she the one that lives in

6  New Rochelle?

7      A      Yes.

8      Q      What's her address?

9      A      She's on Cole Terrace.

10     Q      C-O-L-T?

11     A      C-O-L-E.

12     Q      C-O-L-E.  Okay.

13            What information does she have

14  about the case?

15     A      Pretty much what I told her.

16            MR. McGOWAN:  Can we go off the

17     record.

18            (Discussion off the record.)

19     Q      In connection with your

20  treatment at Harbour Pointe, was there --

21  were you admitted there because of an

22  attempted suicide?

23     A      No.

24     Q      Did they prescribe to you any

25  medication when you were there at Harbour

120

CARELLO

Pointe?

    A     No.

    Q     Are you taking any medication currently?

    A     No.

    Q     Have you ever taken psychiatric medication?

    A     No.

    Q     Prozac or Lip -- not Lipitor. Anything like that, any antidepressants?

    A     Nothing like that.

    Q     How was your treatment at Harbour Pointe paid for?

    A     It was paid for independently.

    Q     That was not covered by any --

    A     Not covered by health insurance.

    Q     How much was it?

    A     18,000.

    Q     And have you paid that in full or is there still a balance due?

    A     It's paid in full.

    Q     You were there for five weeks you said?

122

CARELLO

1

2  initiative, was there anyone else who

3  played a role in the decision to place

4  you under care at Harbour Pointe?

5      A      Nobody places you under care.

6  You volunteer.

7           MR. McGOWAN:  Just is there

8      anybody else involved?  Or did you

9      just do this completely on your own?

10     A      Just family members, that's it.

11  We discussed it.

12     Q      Which family members?

13     A      My entire family.

14     Q      Did you see or seek psychiatric

15  or psychological care more locally before

16  you decided to go to Baltimore, to

17  Harbour Pointe in Baltimore?

18     A      Yes.

19     Q      Where did you go?

20     A      I didn't go.  I seeked it in

21  the phone book, but -- the phone book,

22  and also my provider book for my health

23  insurance, but I didn't like -- I didn't

24  like the fact that there was no place to

25  go to get away.  It was all pretty much

123

CARELLO

1

2    in an office.  It wasn't an inpatient

3    program close by.

4        Q      Did you ever actually meet with

5    a psychologist or psychiatrist in the

6    local area?

7        A      Besides the person who I sold

8    my house to, no.

9        Q      When you say your house, you

10   mean --

11       A      The one in Scarsdale.

12       Q      What's the name of that person?

13       A      Edbert Tan.

14              But I didn't see him on a

15   professional level.  He's just a

16   psychologist that just happened to buy my

17   house.

18       Q      Did you ever -- spell his name,

19   please.

20       A      E-D-B-E-R-T.

21       Q      And his last name?

22       A      T-A-N.

23       Q      Did you ever talk to him about

24   the incident?

25       A      No.

125

CARELLO

1

2      Q      Do you see in the upper right

3  where it says "Verified Complaint"?

4      A      Yes.

5      Q      Have you seen this before?

6      A      I believe I have.

7      Q      Go to the very, very last page

8  of the exhibit.

9             That's your signature there?

10     A      Yes.

11     Q      Are the factual allegations in

12  the Complaint that begin at paragraph 6,

13  are they accurate?

14            (Pause.)

15            MR. McGOWAN:  Take your time and

16        read through it.

17            THE WITNESS:  I'm going to read

18        through it.

19     Q      Take your time.

20            (Pause.)

21     A      It's accurate, yes.

22     Q      I just turn your attention to

23  paragraph 12.

24     A      Uh-huh.

25     Q      It says "Upon information and

126

CARELLO

1  

2  belief, Defendants, the City of New

3  Rochelle and the New Rochelle Police

4  Department, authorized, tolerated and

5  ratified the misconduct of Defendant

6  Rosenbergen herein detailed by (a)

7  failing to properly discipline, restrict

8  and control employees."

9       Did I read that correctly so

10  far?

11    A    Yes.

12    Q    Do you have any information

13  concerning the allegation that there was

14  a failure to discipline, restrict and

15  control employees?

16    A    Say the question again, please.

17       MR. LOOMBA:  Could you read that

18    back.

19       (Record read.)

20    A    Yes.

21    Q    What information do you have?

22    A    The information I had given in

23  my testimony.

24    Q    This is concerning Sergeant

25  Rosenbergen?

127

CARELLO

1

2      A      Yes.

3      Q      Besides that, is there any

4   other information that you possess?

5             (Pause.)

6      A      Do you mind if I take a

7   bathroom break?

8      Q      Not at all.

9             (Recess taken.)

10            MR. LOOMBA:  Can you read the

11         last question and the answer before

12         that just to give him context.

13            (Record read.)

14     A      Other than my testimony, no.

15     Q      Subsection (b) of paragraph 12,

16   "Failing to take adequate precautions in

17   the hiring, training, retention and

18   promotion of employees."

19            Other than with regard to the

20   testimony you've given today concerning

21   then Sergeant Rosenbergen --

22            MR. LOOMBA:  And, for the

23         record, he's currently Lieutenant

24         Rosenbergen.

25     Q      -- what information do you

128

1                     CARELLO

2   possess about hiring, training, retention

3   and promotion?

4        A       Nothing.

5        Q       (c), "Failing to forward the

6   District Attorney's Office of

7   Westchester --

8               MR. LOOMBA:  Strike that.

9        Q       "Failing to forward to the

10  District Attorney's Office of Westchester

11  evidence in connection with criminal acts

12  of employees."

13              What information do you have

14  about that allegation?

15       A       Other than my testimony, none.

16       Q       Was -- is there specific

17  evidence that you are referring to in

18  connection with Sergeant Rosenbergen in

19  this part of the -- of paragraph 12?

20       A       Repeat the question.

21       Q       I'm just trying to understand

22  this allegation.  You are saying "failing

23  to forward to the District Attorney's

24  Office of Westchester evidence in

25  connection with the criminal acts of

129

1                    CARELLO

2  employees."

3            The criminal act is the one

4  that you are alleging that Sergeant

5  Rosenbergen made, or is there some other

6  criminal act?

7      A      That's what I would be

8  referring to in my testimony.

9      Q      Everything concerning Sergeant

10  Rosenbergen, is that right?

11      A      That is correct.

12      Q      And then the second part of

13  subparagraph (c) is "And failing to

14  establish a meaningful departmental

15  system for dealing with complaints of

16  police misconduct."

17            Can you elaborate on that?

18      A      I would refer to my testimony.

19      Q      Okay.  That's fine.

20            Have you signed any

21  authorizations for the release of any

22  medical records in connection with this

23  case?

24      A      Yes.

25            MR. LOOMBA:  Have you provided

```
                        CARELLO
 1
 2    Exhibit D, please.
 3                (Pause.)
 4        A       Okay.
 5        Q       Have you seen this document
 6    before?
 7        A       I don't recall it.
 8        Q       In connection with the tickets
 9    that you received on January 11, 2006,
10    did you plead guilty?
11        A       I plea bargained.
12        Q       When did that happen?
13        A       I don't know if this is the
14    date on here or not.  I can't recall the
15    date.
16        Q       Were you represented by an
17    attorney when you did that?
18        A       No.
19        Q       This indicates there was plea
20    on July 21, 2006.  Is that consistent
21    with your recollection of when you pled
22    guilty?
23                MR. McGOWAN:  When he reached a
24        plea.
25        A       It looks accurate.
```

132

CARELLO

1

2    Q    And it says on this document

3  that you pled guilty to the speeding

4  ticket.  Is that right?

5    A    I believe I pleaded guilty to

6  the speeding ticket and it lists other

7  tickets.

8         MR. McGOWAN:  What's the date on

9     that?  July 21?

10        MR. LOOMBA:  2006.

11        MR. McGOWAN:  Thank you.

12    Q    Now, besides the $18,000 that's

13  the treatment cost at Harbour Pointe, are

14  there any other expenses that you claim

15  as damages in this case?

16        MR. McGOWAN:  Just so you know

17     what counsel means, he means

18     out-of-pocket expenses.

19         Is that correct?

20        MR. LOOMBA:  That's right.

21        MR. McGOWAN:  Money that came

22     out of your pocket.

23    A    I'm sure that there are, but

24  how much, I don't recall.

25    Q    Are you claiming any attorney's

140

1

2       second, if you would.

3              (Pause.)

4              MR. McGOWAN:    Thanks.

5              (Time noted: 1:24 p.m.)

6

7

8              _____

9                    JOHN CARELLO

10

11   Subscribed and sworn to before me

12   this ____ day of _____ , 2007

13

14   _____.

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

   I, Reva Weiss, a Notary Public within
and for the state of New York, do hereby
certify that the foregoing witness,
JOHN CARELLO, was duly sworn on the date
indicated, and that the foregoing is a
true and accurate transcription of my
stenographic notes.

   I further certify that I am not
employed by nor related to any party to
this action.

_Reva Weiss_
_____

REVA WEISS

142

```
 1
 2              E X H I B I T S
 3
 4   DEFENDANTS'
 5   NO.          DESCRIPTION              PAGE
 6   A       Notice Of Claim               16
 7   B       Civilian Complaint Form       78
 8   C       Summons and Complaint        124
 9   D       Certificate Of Disposition   130
10
11                  *  *  *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```